

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LOCAL UNION 1158 I.B.E.W.     :     CIVIL ACTION
PENSION FUND-PA, et al.       :
                              :
        v.                    :
                              :
H.H. FLUORESCENT PARTS, INC., :     NO. 06-5171
et al.                        :

**FILED**

FEB 2 7 2008

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

<u>MEMORANDUM</u>

Bartle, C.J.                          February 27, 2008

Plaintiffs Local Union 1158 I.B.E.W. Pension Fund-PA
and Joseph P. Calabro, Gene J. Sette, Kenneth C. McArthur, Jr.,
and Lisa Gibson, as Trustees of the Fund, have sued defendants
H.H. Fluorescent Parts, Inc. ("H.H. Parts"), H.H. Distribution
Management, L.L.C. ("HHDM"), Hillen Management Group, L.L.C.
("HMG"), Hillen Real Estate Associates, L.P. ("HREA"), H.H.
Distributions, L.P. ("H.H. Distributions") (collectively, the
"business entity defendants"), Robert Hillen, Sr., Kathleen
Hillen, and Robert Hillen, Jr. (collectively, the "individual
defendants") for accelerated withdrawal liability arising under
the provisions of the Employee Retirement Income Security Act of
1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, as amended by the
Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29
U.S.C. §§ 1381-1461, plus interest, liquidated damages,
attorneys' fees, and costs.

Now before the court are:  (1) the motion of plaintiffs for summary judgment; and (2) the cross-motion of the individual defendants for summary judgment.

## I.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).  After reviewing the evidence, the court makes all reasonable inferences from the evidence in the light most favorable to the non-movant.  In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

## II.

Plaintiff Local Union 1158 I.B.E.W. Pension Fund-PA (the "Fund") is a Taft-Hartley trust fund established and maintained for the purpose of providing retirement and other related benefits to eligible participants and beneficiaries pursuant to 29 U.S.C. § 186(c)(5).  Members of the Fund's Board of Trustees include plaintiffs Kenneth C. McArthur, Jr. and Lisa Gibson, who represent the contributing employers, and Gene J.

-2-

Sette and Joseph P. Calabro, who represent I.B.E.W. Local 1158 (the "Union").[1]

The Board of Trustees is the plan sponsor of Local Union 1158 I.B.E.W. Pension Plan-PA (the "Plan"),[2] a multiemployer plan within the meaning of 29 U.S.C. § 1002(37). The Plan is also an employee pension benefit plan within the meaning of 29 U.S.C. §§ 1002(2) and (3), and a defined benefit plan within the meaning of 29 U.S.C. § 1002(35).  The board members are fiduciaries of the Plan within the meaning of 29 U.S.C. § 1002(21)(A).

Defendant H.H. Fluorescent Parts, Inc. ("H.H. Parts"), a corporation established and existing under the laws of the Commonwealth of Pennsylvania, is a participating employer in the Plan by virtue of a series of collective bargaining agreements ("CBAs") with the Union.[3]  The last CBA was in effect from November 24, 2002 to November 24, 2005.[4]

In 1995, defendants Robert Hillen, Sr., his wife, Kathleen Hillen, and their son, Robert Hillen, Jr., acquired H.H. Parts, each taking a one-third ownership interest in the company.

---

1.  I.B.E.W. Local 1158 is the successor by merger to I.B.E.W. Local 1841.

2.  Local Union 1158 I.B.E.W. Pension Plan-PA was formerly known as Local Union 1841 I.B.E.W. Pension Plan-PA.

3.  H.H. Parts is an employer within the meaning of 29 U.S.C. §§ 1002(5), (11), and (12), and 29 U.S.C. § 185(a).

4.  The CBA contained a self-renewal provision that extended its application until the company's eventual cessation of operations on December 31, 2005.

At the time, H.H. Parts had both a manufacturing operation, in which it assembled lighting fixture parts, and a distribution operation, in which it purchased parts from overseas and resold them to other lighting fixture manufacturers.  After acquiring H.H. Parts, the individual defendants set up a limited partnership, Hillen Real Estate Associates, L.P. ("HREA"), to serve as a holding company for the business's two real estate parcels.[5]  They also established Hillen Management Group, L.L.C. ("HMG"), a Pennsylvania corporation owned entirely by Hillen Sr., which serves as HREA's sole general partner.  Both entities list the same principal place of business as H.H. Parts.

In 1998, the individual defendants arranged for several business loans from Willow Grove Bank.  These included a mortgage loan to HREA, a term loan and a line of credit to H.H. Parts, and three personal loans to the individual defendants that were used to pay off the balance of a "personal Note to the seller" issued in their 1995 acquisition of H.H. Parts.

By April, 2003, the original mortgage had a balance of roughly $880,000; the term loan had a balance of roughly $218,000; and the line of credit had a balance of roughly $264,000 due.  H.H. Parts was also carrying a debt of roughly $368,000 to the three individual defendants.  At that point, the defendants refinanced all the loans with Commerce Bank.  HREA obtained a new mortgage on each parcel, one for $1,100,000 and

---

5.  HREA is held in the following percentages:  Hillen Sr. - 30%; Kathleen - 33%; Hillen Jr. - 33%; and HMG - 4%.

the other for $270,000, and also drew upon a new line of credit for $400,000.  The Willow Grove Bank loans were paid off and the company's debt to stockholders was cut by $352,000 down to $16,000.  The new loans were personally guaranteed by the three individual defendants and were made contingent upon Commerce Bank's yearly review of pertinent financial information for both the business entity defendants and the individual defendants.

Tax records establish that during 2003, HREA disbursed roughly $174,210 to Hillen Sr., $174,346 to Kathleen, and $172,596 to Hillen Jr., totaling roughly $521,000.  As noted above, roughly $352,000 of that total was Commerce Bank loan money disbursed to the individual defendants in repayment of their stockholder loans to H.H. Parts.  The individual defendants then used those funds to repay the outstanding Willow Grove Bank personal loans, which amounted to more than $300,000.

In 2004, HREA sold the smaller of its two properties for $442,500, which resulted in a cash surplus after the payoff of the $270,000 mortgage and also constituted a capital gain of roughly $228,000 for the partnership.  HREA then distributed $50,000 to each of the individual defendants, which they assert was partially used to pay the tax liability associated with the capital gain.  Apart from these disbursements, Hillen Sr. and Kathleen reported a combined salary from H.H. Parts of $48,025 in 2003 and $127,500 in 2004, while Hillen Jr. reported a total salary of $33,250 in 2003 and $90,000 in 2004.

-5-

By early 2004 at the latest, the individual defendants realized that although H.H. Parts' distribution operation was profitable, its manufacturing operation was foundering. On April 29, 2004, H.H. Parts wrote to the Fund asking for an estimation of H.H. Parts' withdrawal liability under ERISA if the company were to cease operations. On May 18, 2004, the Fund advised H.H. Parts that it would have to pay the reasonable cost of the calculation, in this case $3500, pursuant to 29 U.S.C. § 1401(e). H.H. Parts never forwarded this payment. By letter dated June 17, 2004, the Fund advised H.H. Parts that if it were to cease operations immediately, "withdrawal liability would be imposed."

Late in 2004, the individual defendants decided to separate H.H. Parts' two operations into distinct legal entities. Hillen Sr. thus created defendant H.H. Distributions, L.P. ("H.H. Distributions"), a Pennsylvania limited partnership that would serve as the new embodiment of H.H. Parts' distribution operation. Hillen Sr. also formed and took 100% ownership of defendant H.H. Distribution Management, L.L.C. ("HHDM"), a Pennsylvania limited liability company created to be the general partner for H.H. Distributions. H.H. Distributions is owned in the following percentages: Hillen Sr. - 49% (limited partner); Kathleen - 50% (limited partner); HHDM - 1% (general partner).

Although these changes increased the number of business entities in play, they did not affect the day-to-day functioning of the manufacturing and importing operations. The two new

-6-

entities, HHDM and H.H. Distributions, shared the same business address as H.H. Parts.  H.H. Distributions served the same customers as it did while still an operation of H.H. Parts.  All employees of H.H. Distributions, including the individual defendants, continued to occupy their old offices.  Moreover, although H.H. Distributions became the employer of record for H.H. Parts' five non-union employees, those employees continued to perform their old duties.

In early 2004, shortly after creating HHDM and H.H. Distributions, Hillen Sr. and Kathleen each transferred their one-third interest in the now-unprofitable H.H. Parts to their son, Hillen Jr., without receiving any payment in return, although it should be noted that Hillen Jr. had not received any ownership share in H.H. Distributions.[6]  From that point forward, Hillen Sr. and Kathleen eschewed salary payments from H.H. Parts. Instead, they received compensation solely from H.H. Distributions.  Over the course of 2005 and 2006, H.H. Distributions made salary distributions to Hillen Sr. and Kathleen of roughly $282,000, or $70,500 apiece annually.

At the same time, H.H. Distributions carried a debt owed to H.H. Parts that totaled $286,389 in 2005, $311,774 in 2006, and $635,289 in 2007.  That debt was never paid.

---

6.  Also after giving up their ownership stakes in H.H. Parts, Hillen Sr. and Kathleen rolled over an $815,905 pension fund to a new account.

-7-

On December 31, 2005, H.H. Parts permanently ceased operations and completely withdrew from the Fund as defined by 29 U.S.C. § 1383(a)(1).  By letter dated April 10, 2006, the Fund notified H.H. Parts that its December 31, 2005 withdrawal had triggered withdrawal liability in the amount of $826,221.00, to be paid in quarterly installments of $19,482.00 beginning on June 9, 2006.

H.H. Parts failed to pay its June 9, 2006 withdrawal liability installment payment.  By letter dated June 15, 2006, the Fund notified H.H. Parts of its default.  The letter stated that if the withdrawal liability payment was not received by June 23, 2006, the Fund would take all actions available to it under ERISA.  H.H. Parts again failed to pay the amount due.  By letter dated October 10, 2006, the Fund advised H.H. Parts that it had elected to accelerate H.H. Parts' withdrawal liability payment due to H.H. Parts' default, thereby making the full withdrawal liability amount of $826,221.00 due immediately.[7]

H.H. Parts has allowed the statutory deadline for challenging either the fact or amount of the withdrawal liability through arbitration under 29 U.S.C. § 1401(a)(1) to lapse.  To date, the Fund has received no withdrawal liability payments from H.H. Parts or any of the other individual defendants or business entities.

---

7.  The acceleration was permissible under § 4219(c)(5) of ERISA, 29 U.S.C. § 1399(c)(5).

On January 29, 2008, the two operating business entities, H.H. Parts and H.H. Distributions, and the real estate holding entity, HREA, filed for bankruptcy. As such, this action has been stayed as to those three defendants. Plaintiffs now move for summary judgment against the remaining defendants, arguing that: (1) HMG and HHDM are subject to joint and several liability for the accelerated withdrawal liability of H.H. Parts; and (2) the individual defendants are personally liable for the accelerated withdrawal liability. The individual defendants likewise move for summary judgment, arguing that the individual defendants are not liable for the withdrawal liability. Nevertheless, the individual defendants have recently conceded that H.H. Parts and the other business entity defendants are all jointly and severally liable for the accelerated withdrawal liability.

III.

Congress enacted the Employee Retirement Income Security Act ("ERISA") in 1974 "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 720 (1984). Likewise, Congress enacted the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") "out of concern that multiemployer pension plans would collapse as employers withdrew if the remaining contributors became too few in number to pay the

unfunded vested benefits." <u>Galgay v. Beaverbrook Coal Co.</u>, 105
F.3d 137, 139 (3d Cir. 1997) (citations omitted).  Thus, MPPAA
mandates that an employer withdrawing from a multiemployer
pension plan pay "withdrawal liability," which is equivalent to
the employer's proportionate share of the plan's unfunded vested
benefits.  <u>See</u> 29 U.S.C. §§ 1381, 1391.  Our Court of Appeals has
stated that "because ERISA (and the MPPAA) are remedial statutes,
they should be liberally construed in favor of protecting the
participants in employee benefit plans."  <u>IUE AFL-CIO Pension
Fund v. Barker & Williamson, Inc.</u>, 788 F.2d 118, 127 (3d Cir.
1986) (citations omitted).

     A pension fund must follow a series of statutory
procedural steps in order to calculate and obtain withdrawal
payments from an exiting employer.  In the event of an employer's
"complete withdrawal" from a plan, the plan sponsor must
calculate the amount of the withdrawal liability, provide the
employer with both the amount of liability and a schedule for
payment, and make a demand for payment in accordance with that
schedule.  <u>Id.</u> § 1399(b)(1).  If an employer wishes to contest
the fact of its liability or the calculated amount of liability,
the employer must initiate arbitration against the fund within
sixty days of receipt of the initial demand.  <u>Id.</u> § 1399(c)(5).
If the employer fails to initiate arbitration on a timely basis,
the right to contest the assessment on the merits is permanently
waived.  <u>Id.</u> § 1401(b)(1); <u>see</u> <u>IUE AFL-CIO Pension Fund</u> at 126.

If the employer fails to make any installment payment within sixty days after receipt of a failure-to-pay notice, the plan sponsor is entitled to "accelerate" the debt, thereby making the entirety of the withdrawal liability due immediately.  <u>Id.</u> § 1399(c)(5).  "When an employer fails to make a withdrawal liability payment within the prescribed time, an action may be brought in federal or state court to compel payment.  The plan sponsor need show only that it made a demand for interim payments under 29 U.S.C. § 1382 and that the payments were not made."  <u>Galgay</u>, 105 F.3d at 139 (citing 29 U.S.C. § 1451(b) & (c)).

The statutory framework also contains provisions that allow a fund to hold parties other than the employer of record liable for the withdrawal liability.  "Under ERISA, the term 'employer' encompasses any trade or business under common control with the organization whose withdrawal triggers the liability.  A pension plan may demand and collect withdrawal payments from any such trade or business."  <u>Teamsters Pension Trust Fund of Philadelphia v. Brigadier Leasing Assocs.</u>, 880 F. Supp. 388, 392 (E.D. Pa. 1995) (citing 29 U.S.C. § 1301(b)(1)).

The term "trades or businesses ... under common control" is defined by regulations promulgated by the Internal Revenue Service.  29 U.S.C. § 1301(b)(1).  One such definition provides that trades or businesses are under common control if they constitute a "brother-sister group."  26 C.F.R. § 1.414(c)-2(c).  "[A] brother-sister group is formed by two or more organizations where five or fewer persons own a controlling

-11-

interest in each organization and such persons are in effective control of each organization.  Effective control is found where the sum of the lowest percentage interest of each person in each organization is 50% or more."  Teamsters Pension Trust Fund, 880 F. Supp. at 392 (citing 26 C.F.R. § 1.414(c)-2(c)).

A fund need not take additional procedural steps to obtain reimbursement from control group members.  Actual notice to the employer corporation of its withdrawal liability serves as constructive notice to all members of the control group.  Id. at 127-28.  Likewise, the employer corporation's failure to make payment or demand arbitration within sixty days of receipt of demand is sufficient ground for a finding of liability against all members of the control group.  IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118, 127-130 (3d Cir. 1986).

IV.

The first question before us is whether the two business entity defendants not in bankruptcy, HMG and HHDM, should be subject to joint and several liability for the accelerated withdrawal liability of H.H. Parts.

Here, the relevant facts are not in dispute:  defendant H.H. Parts went out of business and completely withdrew from Local Union 1158 I.B.E.W. Pension Plan-PA.  The plaintiff Fund was therefore entitled to, and did, calculate withdrawal liability, send a notice of such liability and a schedule for payment to H.H. Parts, and demand payment of the withdrawal liability from H.H. Parts.  The Fund complied with all procedural

-12-

requirements under the relevant statutes.  H.H. Parts then failed to make payment or demand arbitration on a timely basis.  Having completed the requisite steps, the Fund brought this lawsuit in federal court.  As noted above, the individual defendants, who constitute the only stockholders and/or partners of each business entity defendant, have recently conceded that the business entity defendants are each jointly and severally liable for the accelerated withdrawal liability.

Accordingly, we will grant summary judgment in favor of plaintiffs and against Hillen Management Group, L.L.C. and H.H. Distribution Management, L.L.C., the two business entity defendants as to which this action has not been stayed, in the amount of (1) the accelerated withdrawal liability of $826,221.00; (2) interest on that amount accruing from June 9, 2006, the date of non-payment,[8] to be calculated pursuant to 29 U.S.C. § 1399(c)(6) and 29 C.F.R. § 4219.32; (3) liquidated damages of 20% of the withdrawal liability totaling $165,244.20;[9] and (4) reasonable attorneys' fees and costs.[10]

V.

The second question before us is whether the individual defendants are liable for the accelerated withdrawal liability of H.H. Parts.

---

8.   See 29 U.S.C. § 1132(g)(2)(B); 29 C.F.R. § 4219.32(d).

9.   See 29 U.S.C. § 1132(g)(2)(C)(ii).

10.  See id. § 1132(g)(2)(D).

Plaintiffs assert that under the "alter ego" doctrine, we should disregard the corporate form of H.H. Parts and the other business entity defendants to hold the individual defendants liable for the withdrawal liability.  It is well established that "in cases involving claims to pension benefits protected by ERISA, as amended by the MPPAA, there is 'a federal interest supporting disregard of the corporate form to impose liability'" against individuals.  Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 169 (3d Cir. 2002) (quoting Lumpkin v. Envirodyne Indus., Inc., 933 F.2d 449, 460-61 (7th Cir. 1991)).

Our Court of Appeals announced that when applying the "Third Circuit alter ego test," the court must consider the following eight factors:

> gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder.

Trustees of the Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk, 332 F.3d 188, 194 (3d Cir. 2003) (internal quotations omitted).  The Lutyk court noted that this is not meant to be a "rigid test" and that a plaintiff need not prove actual fraud.  332 F.3d at 194.  The panel further explained that "[w]hile piercing the corporate veil is an equitable remedy, and therefore the situation must present an element of injustice or

-14-

fundamental unfairness ... a number of these factors can be sufficient to show such unfairness." Id. (internal quotations and citations omitted).  Notably, however, alter ego liability must be proven by clear and convincing evidence.  Id. at 192.

In light of the incomplete and convoluted factual record before us, we are unable to weigh several of the Lutyk factors, including the solvency of the respective business entities, the extent, if any, of siphoning of funds, and the balance of the equities, that is, whether an element of injustice or fundamental unfairness exists.  It must also be emphasized that we evaluate the current factual record for each motion for summary judgment in the light most favorable to the opposing party.  Given this backdrop, we will deny the cross-motions for summary judgment as to whether the individual defendants are personally liable for the accelerated withdrawal liability of H.H. Parts on the ground that there exist genuine issues of material fact.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LOCAL UNION 1158 I.B.E.W.            CIVIL ACTION
PENSION FUND-PA, et al.   :

       v.            FEB 2 7 2008

H.H. FLUORESCENT PARTS, INC.   :   NO. 06-5171
et al.   :

ORDER

AND NOW, this 27th day of February, 2008, for the
reasons set forth in the accompanying memorandum, it is hereby
ORDERED that:

(1)  the motion of plaintiffs Local Union 1158 I.B.E.W.
Pension Fund-PA and Joseph P. Calabro, Gene J. Sette, Kenneth C.
McArthur, Jr., and Lisa Gibson, as Trustees of the Fund, for
summary judgment against defendants H.H. Distribution Management,
L.L.C. and Hillen Management Group, L.L.C. is GRANTED;

(2)  judgment is entered in favor of plaintiffs Local
Union 1158 I.B.E.W. Pension Fund-PA and Joseph P. Calabro, Gene
J. Sette, Kenneth C. McArthur, Jr., and Lisa Gibson, as Trustees
of the Fund, and against defendants H.H. Distribution Management,
L.L.C. and Hillen Management Group, L.L.C. jointly and severally
in the amount of:  (a) the accelerated withdrawal liability of
$826,221.00; (b) interest on that amount accruing from June 9,
2006, the date of non-payment, to be calculated pursuant to 29
U.S.C. § 1399(c)(6) and 29 C.F.R. § 4219.32; (c) liquidated

damages of 20% of the withdrawal liability totaling $165,244.20; and (d) reasonable attorneys' fees and costs; and

(3) the motion of plaintiffs Local Union 1158 I.B.E.W. Pension Fund-PA and Joseph P. Calabro, Gene J. Sette, Kenneth C. McArthur, Jr., and Lisa Gibson, as Trustees of the Fund, for summary judgment against defendants Robert Hillen, Sr., Kathleen Hillen, and Robert Hillen, Jr. and the cross-motion of defendants Robert Hillen, Sr., Kathleen Hillen, and Robert Hillen, Jr. for summary judgment against plaintiffs Local Union 1158 I.B.E.W. Pension Fund-PA and Joseph P. Calabro, Gene J. Sette, Kenneth C. McArthur, Jr., and Lisa Gibson, as Trustees of the Fund are DENIED.

BY THE COURT:

_____
                        C.J.

-2-