```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LOCAL UNION 1158 I.B.E.W.        :     CIVIL ACTION
PENSION FUND-PA, et al.          :
                                 :
          v.                     :
                                 :
H.H. FLUORESCENT PARTS, INC.,    :
et al.                           :     NO. 06-5171
```

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Bartle, C.J.                                          June 30, 2008

Plaintiffs Local Union 1158 I.B.E.W. Pension Fund-PA and Joseph P. Calabro, Gene J. Sette, Kenneth C. McArthur, Jr., and Lisa Gibson, as Trustees of the Fund, filed this lawsuit against defendants H.H. Fluorescent Parts, Inc. ("H.H. Parts"), H.H. Distribution Management, L.L.C. ("HHDM"), Hillen Management Group, L.L.C. ("HMG"), Hillen Real Estate Associates, L.P. ("HREA"), H.H. Distributions, L.P. ("H.H. Distributions") (collectively, the "business entity defendants"), Robert Hillen, Sr., Kathleen Hillen, and Robert Hillen, Jr. (collectively, the "Hillens").  Plaintiffs seek accelerated withdrawal liability arising under the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381-1461, plus interest, liquidated damages, attorneys' fees, and costs.

In January, 2008, defendants H.H. Parts, HHDM, and H.H. Distributions filed for bankruptcy.  We subsequently granted

summary judgment in favor of plaintiffs and against the remaining business entity defendants, HHDM and HMG, both of which then also filed for bankruptcy.  The parties waived their right to a jury, and the case proceeded with a bench trial solely on plaintiffs' claims against the Hillens.  We now make the following findings of fact and conclusions of law.

      Plaintiff Local Union 1158 I.B.E.W. Pension Fund-PA (the "Fund") is a Taft-Hartley trust fund established and maintained for the purpose of providing retirement and other related benefits to eligible participants and beneficiaries pursuant to 29 U.S.C. § 186(c)(5).  Members of the Fund's Board of Trustees include plaintiffs Kenneth C. McArthur, Jr. and Lisa Gibson, who represent the contributing employers, and Gene J. Sette and Joseph P. Calabro, who represent I.B.E.W. Local 1158 (the "Union").[1]  The Board of Trustees is the plan sponsor of Local Union 1158 I.B.E.W. Pension Plan-PA (the "Plan"),[2] a multiemployer plan within the meaning of 29 U.S.C. § 1002(37). The Plan is also an employee pension benefit plan under 29 U.S.C. §§ 1002(2) and (3), and a defined benefit plan under 29 U.S.C. § 1002(35).  The board members are fiduciaries of the Plan as set forth in 29 U.S.C. § 1002(21)(A).

---

1.  I.B.E.W. Local 1158 is the successor by merger to I.B.E.W. Local 1841.

2.  Local Union 1158 I.B.E.W. Pension Plan-PA was formerly known as Local Union 1841 I.B.E.W. Pension Plan-PA.

Defendant H.H. Parts, a corporation established and existing under the laws of the Commonwealth of Pennsylvania, was a participating employer in the Plan by virtue of a series of collective bargaining agreements ("CBAs") with the Union.[3] The last CBA was in effect from November 24, 2002 to November 24, 2005.[4] In 1995, the Hillens acquired H.H. Parts, each taking a one-third ownership interest in the company. At the time, H.H. Parts had both a manufacturing operation, in which it assembled lighting fixture parts, and a distribution operation, in which it purchased parts from overseas and resold them to other lighting fixture manufacturers.

After acquiring H.H. Parts, the Hillens set up a limited partnership, HREA, to serve as a holding company for the two real estate parcels on which the business operated, located at 104 Beecher Avenue and 426 Laurel Avenue, both in Cheltenham, Pennsylvania. HREA has never had business operations or assets other than its ownership of the real property used by all of the business entity defendants. The Hillens also established HMG, a Pennsylvania corporation owned entirely by Hillen Sr., which serves as HREA's sole general partner. HREA is thus held in the following percentages: Hillen Sr. - 30%; Kathleen - 33%; Hillen Jr. - 33%; and HMG - 4%. The principal place of business of HREA

---

3. H.H. Parts is an employer within the meaning of 29 U.S.C. §§ 1002(5), (11), and (12), and 29 U.S.C. § 185(a).

4. The CBA contained a self-renewal provision that extended its application until the company's eventual cessation of operations on December 31, 2005.

and HMG is located at 104 Beecher Avenue, Cheltenham, Pennsylvania, the same location as H.H. Parts.  Until 2004, H.H. Parts paid rent to HREA for use of the real property and also paid HREA's carrying costs for the two properties.

In 1998, the Hillens arranged for several business loans from Willow Grove Bank.  These included a mortgage loan to HREA, a term loan and a line of credit to H.H. Parts, and three personal loans, one to each of the Hillens.  By April, 2003, the original mortgage had a balance of approximately $880,000; the term loan had a balance of approximately $218,000; and the line of credit had a balance of approximately $264,000 due.  H.H. Parts was also carrying a debt of approximately $368,000 to the three Hillens.  At that point, the Hillens refinanced all loans with Commerce Bank.  HREA obtained a new mortgage on each parcel, one for $1,100,000 and the other for $270,000, and also drew upon a new line of credit for $400,000.  The Willow Grove Bank loans, including the three personal loans to the Hillens, were paid off, and the company's debt to stockholders was cut by $352,000 to $16,000.  The new loans were personally guaranteed by the Hillens and made contingent upon Commerce Bank's yearly review of pertinent financial information.  There is no evidence that the Hillens were aware of any potential withdrawal liability when the Commerce Bank refinancing took place in 2003.

Tax records establish that during 2003, HREA disbursed approximately $174,210 to Hillen Sr., $174,346 to Kathleen Hillen, and $172,596 to Hillen Jr., totaling approximately

$521,000.  As noted above, approximately $352,000 of that total was loan money from Commerce Bank, disbursed to the Hillens in repayment of H.H. Parts' outstanding debt to them.  The Hillens then used those funds to repay the outstanding Willow Grove Bank personal loans, which amounted to approximately $300,000.  In 2004, HREA sold the property located at 426 Laurel Avenue for $442,500, which resulted in a cash surplus after the payoff of the $270,000 mortgage and a capital gain of approximately $228,000 for the partnership.  HREA then distributed $50,000 to each of the Hillens, which was partially used to pay the tax liability associated with the capital gain.  Hillen Sr. and Kathleen Hillen reported a combined salary from H.H. Parts of $48,025 in 2003 and $127,500 in 2004, while Hillen Jr. reported a total salary from H.H. Parts of $33,250 in 2003 and $90,000 in 2004.

By early 2004, the Hillens realized that although H.H. Parts' distribution operation was profitable, its manufacturing operation was foundering, consistent with an industry-wide downturn.  On April 29, 2004, H.H. Parts wrote to the Fund asking for an estimation of H.H. Parts' withdrawal liability under ERISA if the company were to cease operations.  From the date of the Hillens' purchase of H.H. Parts until the date of the company's withdrawal from the Fund, H.H. Parts had made every scheduled Fund contribution on a timely basis.  On May 18, 2004, the Fund advised H.H. Parts that it would have to pay the reasonable cost of the calculation, in this case $3500, pursuant to 29 U.S.C.

§ 1401(e). H.H. Parts never forwarded this payment. By letter dated June 17, 2004, the Fund advised H.H. Parts that if it were to cease operations immediately, "withdrawal liability would be imposed."

Late in 2004, the Hillens on the advice of their accountant decided to separate H.H. Parts' two operations into distinct legal entities. Hillen Sr. created H.H. Distributions, a Pennsylvania limited partnership that would serve as the new embodiment of H.H. Parts' distribution operation. Also at that time, Hillen Sr. formed and took 100% ownership of HHDM, a Pennsylvania limited liability company created to be the general partner for H.H. Distributions. H.H. Distributions is thus owned in the following percentages: Hillen Sr. - 49% (limited partner); Kathleen Hillen - 50% (limited partner); HHDM - 1% (general partner). Although the foregoing changes increased the number of business entities in play, they did not affect the day-to-day functioning of the manufacturing and distribution operations. The two new entities, HHDM and H.H. Distributions, shared the same business address as H.H. Parts. H.H. Distributions served the same customers as it did while still an operation of H.H. Parts. All employees of H.H. Distributions, including the Hillens, continued to occupy their old offices. Moreover, although H.H. Distributions became the employer of record for H.H. Parts' five non-union employees, those employees continued to perform their old duties.

Shortly after creating HHDM and H.H. Distributions, Hillen Sr. and Kathleen Hillen each transferred their one-third interest in H.H. Parts to their son, Hillen Jr., in return for a no-interest note to be partially forgiven annually through gift tax exemptions.  After giving up their ownership stakes in H.H. Parts, Hillen Sr. and Kathleen Hillen rolled over an $815,905 pension, funded by Hillen Sr. through his employment since 1962 with H.H. Parts, to a new account with H.H. Distributions.

H.H. Distributions was capitalized by the transfer of existing distribution-related inventory from H.H. Parts, which resulted in a debt owed by H.H. Distributions to H.H. Parts of $286,389 in 2005.  H.H. Distributions incurred a separate liability to H.H. Parts in 2005 for administrative charges associated with sharing H.H. Parts' facilities, estimated by the companies' accountant at $300,000.  After a further transfer of inventory and consolidation of the debts, H.H. Distributions owed H.H. Parts a total of $635,289 in 2007, characterized as an interest-free demand loan.

Beginning in 2005, Hillen Sr. and Kathleen Hillen eschewed salary payments from H.H. Parts and instead received compensation solely from H.H. Distributions in the form of partnership distributions.  Between 2005 and 2007, H.H. Distributions compensated Hillen Sr. and Kathleen Hillen in the amount of $433,944, or $72,324 apiece annually.  Hillen Jr. received wages of $132,500 from H.H. Parts in 2005.  He was

transferred to the payroll of H.H. Distributions in 2006, receiving wages of $143,280 that year and $154,500 in 2007.

On December 31, 2005, H.H. Parts permanently ceased operations and completely withdrew from the Fund as defined by 29 U.S.C. § 1383(a)(1).  By letter dated April 10, 2006, the Fund notified H.H. Parts that its December 31, 2005 withdrawal had triggered withdrawal liability in the amount of $826,221.00, to be paid in quarterly installments of $19,482.00 beginning on June 9, 2006.  H.H. Parts failed to pay its June 9, 2006 withdrawal liability installment payment.  By letter dated June 15, 2006, the Fund notified H.H. Parts of its default.  The letter stated that if the withdrawal liability payment was not received by June 23, 2006, the Fund would take all actions available to it under ERISA.  H.H. Parts again failed to pay the amount due.

By letter dated October 10, 2006, the Fund advised H.H. Parts that it had elected to accelerate H.H. Parts' withdrawal liability payment due to H.H. Parts' default, thereby making the full withdrawal liability amount of $826,221.00 due immediately. The Fund complied with all statutory procedural requirements under ERISA throughout the notification and acceleration process. H.H. Parts allowed the statutory deadline for challenging either the fact or amount of the withdrawal liability through arbitration under 29 U.S.C. § 1401(a)(1) to lapse.  To date, the Fund has received no withdrawal liability payments from H.H. Parts or any of the other defendants.

On January 29, 2008, the Hillens, who constitute the only stockholders of the two operating business entities, H.H. Parts and H.H. Distributions, and the only partners of the real estate holding entity, HREA, caused those entities to file petitions for bankruptcy in the United States Bankruptcy Court for the Eastern District of Pennsylvania.  We accordingly stayed the instant action against those business entity defendants.  On February 27, 2008, we granted summary judgment in favor of plaintiffs and against HMG and HHDM in the amount of (1) the accelerated withdrawal liability of $826,221.00; (2) interest on that amount accruing from June 9, 2006, the date of non-payment, to be calculated pursuant to 29 U.S.C. § 1399(c)(6) and 29 C.F.R. § 4219.32; (3) liquidated damages of 20% of the withdrawal liability totaling $165,244.20; and (4) reasonable attorneys' fees and costs.  The Hillens have conceded that H.H. Parts, H.H. Distributions, and HREA, as members of a "controlled group," are jointly and severally liable for the accelerated withdrawal liability already imposed against HMG and HHDM.

Congress enacted the Employee Retirement Income Security Act ("ERISA") in 1974 "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans."  Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 720 (1984).  Likewise, Congress enacted the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") "out of concern that

multiemployer pension plans would collapse as employers withdrew if the remaining contributors became too few in number to pay the unfunded vested benefits." Galgay v. Beaverbrook Coal Co., 105 F.3d 137, 139 (3d Cir. 1997) (citations omitted).  MPPAA mandates that an employer withdrawing from a multiemployer pension plan pay "withdrawal liability," which is equivalent to the employer's proportionate share of the plan's unfunded vested benefits.  See 29 U.S.C. §§ 1381, 1391.

"Because ERISA (and the MPPAA) are remedial statutes, they should be liberally construed in favor of protecting the participants in employee benefit plans."  IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118, 127 (3d Cir. 1986) (citations omitted).  It is well established that "in cases involving claims to pension benefits protected by ERISA, as amended by the MPPAA, there is 'a federal interest supporting disregard of the corporate form to impose liability'" against individuals.  Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 169 (3d Cir. 2002) (quoting Lumpkin v. Envirodyne Indus., Inc., 933 F.2d 449, 460-61 (7th Cir. 1991)).

Plaintiffs, who have already obtained judgments against two of the business entity defendants, now seek to recover the accelerated withdrawal liability from the Hillens as individuals under an alter ego theory, through "piercing the corporate veil" of the various business entities controlled by the Hillens.  In Trustees of the National Elevator Industry Pension, Health

Benefit and Educational Funds v. Lutyk, our Court of Appeals announced that in determining whether alter ego liability is appropriate, we must consider the following eight factors:

> gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder.

332 F.3d 188, 194 (3d Cir. 2003) (internal quotations omitted). This is not meant to be a "rigid test," and a plaintiff need not prove actual fraud. Id. "While piercing the corporate veil is an equitable remedy, and therefore the situation must present an element of injustice or fundamental unfairness ... a number of these factors can be sufficient to show such unfairness." Id. (internal quotations and citations omitted).

The burden of proof for establishing alter ego liability "rests with the party attempting to negate the existence of a separate entity." Id. at 197. Alter ego liability must be established by clear and convincing evidence, id. at 192, and is "notoriously difficult for plaintiffs to meet," Pearson v. Component Tech. Corp., 247 F.3d 471, 485 (3d Cir. 2001).

Plaintiffs in this case have contested only four of the factors listed by our Court of Appeals in Lutyk: gross undercapitalization, insolvency of the debtor corporation, siphoning of funds, and nonfunctioning of officers and directors.

-11-

They concede that the business entity defendants observed corporate formalities, maintained adequate records, did not fail to issue dividends, and were not merely facades for the dominant shareholders.

First, on the record before us, plaintiffs have not proved that the business entity defendants were at any point undercapitalized, let alone grossly undercapitalized, in light of the companies' expected revenue stream and foreseeable liabilities. The business entity defendants carried debts, to be sure, but retained considerable accounts receivable, inventory, and real estate assets. The Hillens testified credibly that the amount of withdrawal liability assessed by the Fund, $826,221.00, came as a complete surprise to them given that their required contributions over the previous ten years in business had totaled approximately $420,000.00.

Second, before the imposition of withdrawal liability, none of the companies was insolvent. H.H. Parts became insolvent when it incurred withdrawal liability. H.H. Distributions, HREA, HMG, and HHDM simultaneously became insolvent only when defendants conceded that they were each also liable for the withdrawal liability as members of a "controlled group."

Third, no improper "siphoning" of funds occurred in connection with the 2003 refinancing. This financial restructuring, which included the repayment of approximately $300,000 in personal loans from Willow Grove Bank to the Hillens, was done at a time when the business entity defendants were

solvent and the prospect of withdrawal liability had not yet arisen. Importantly, documentary evidence establishes that the repayment of the Hillens' personal loans cut H.H. Parts' debt to the three shareholders from $352,000 to $16,000. The effect of the transaction was simply to erase the majority of the company's already-existing debt to the Hillens. We also take into consideration the fact that the three Hillens, who personally guaranteed the new loans from Commerce Bank, drew a combined salary from H.H. Parts of less than $85,000 in 2003, whereas the previous owner had drawn yearly salaries ranging from $250,000 to over $600,000 less than ten years earlier. In sum, we saw no evidence that the 2003 refinancing created an improper financial windfall for, or enabled extravagant personal spending by, the Hillens at the expense of their businesses or the plaintiffs.

Likewise, no improper "siphoning" occurred in connection with the 2004 sale of 426 Laurel Avenue by HREA and the ensuing distribution of approximately $150,000 to the Hillens. To the extent that each of the Hillens retained a sum of less than $50,000 after payment of capital gain taxes, such proceeds were modest and reasonable under the circumstances.

The compensation paid to the Hillens by H.H. Distributions between 2005 and 2007 similarly fails to constitute improper "siphoning" of corporate funds. Hillen Sr. and Kathleen Hillen, although having no specific daily or monthly duties, each contributed regularly and meaningfully to the company's management and operation during that time: Hillen Sr. provided

consulting services based on his many years of experience in the industry, and Kathleen Hillen carried out a variety of bookkeeping tasks.  Moreover, H.H. Distributions was during that time and continues to be a profitable business, and the Hillens were entitled to both reasonable salaries as employees and reasonable distributions as owners during the years in question.

Lastly, credible testimony at trial established that the Hillens adequately fulfilled their roles as officers and directors throughout the years at issue.

The failure by the business entity defendants to satisfy their withdrawal liability obligations is unfortunate and not without consequence to the workers depending on the Fund for their pensions.  Nonetheless, plaintiffs have obtained judgment against the business entity defendants.  H.H. Distributions, although in bankruptcy, continues to be a viable business and may yet satisfy the judgment against it.  Because on the record before us we do not find that the Hillens acted improperly, we do not find an element of unfairness in denying additional recovery to plaintiffs on an alter ego theory.

We note that the facts of this case bear little in common with those of Lutyk.  There, the defendant employed deceit and misdirection to withdraw increasing amounts of funds from the corporate asset pool long after the corporation in question, for which incomplete records were kept, was insolvent.  Here, in stark contrast, we find that defendants did not engage in deception and took only reasonable compensation, most of which

was disbursed long before any of the business entity defendants became insolvent.

        Plaintiffs have not proved their claim for alter ago liability.  Accordingly, we will enter judgment in favor of defendants Robert Hillen, Sr., Kathleen Hillen, and Robert Hillen, Jr. and against plaintiffs Local Union 1158 I.B.E.W. Pension Fund-PA and Joseph P. Calabro, Gene J. Sette, Kenneth C. McArthur, Jr., and Lisa Gibson, as Trustees of the Fund.

```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LOCAL UNION 1158 I.B.E.W.       :     CIVIL ACTION
PENSION FUND-PA, et al.         :
                                :
          v.                    :
                                :
H.H. FLUORESCENT PARTS, INC.,   :
et al.                          :     NO. 06-5171
```

## JUDGMENT

AND NOW, this 30th day of June, 2008, based on the accompanying Findings of Fact and Conclusions of Law, judgment is entered in favor of defendants Robert Hillen, Sr., Kathleen Hillen, and Robert Hillen, Jr. and against plaintiffs Local Union 1158 I.B.E.W. Pension Fund-PA and Joseph P. Calabro, Gene J. Sette, Kenneth C. McArthur, Jr., and Lisa Gibson, as Trustees of the Fund.

BY THE COURT:

/s/ Harvey Bartle III
                                                          C.J.